## MATAKAS v CITIZENS MUTUAL INSURANCE COMPANY

Docket No. 135737. Submitted July 8, 1993, at Detroit. Decided December 6, 1993, at 9:45 A.M.

William and Phillipa Matakas brought an action in the Wayne Circuit Court against Citizens Mutual Insurance Company, seeking a declaration that, under the terms of a liability insurance policy covering realty leased by the plaintiffs to PBM Enterprises, the defendant must defend and indemnify the plaintiffs against an action brought by the federal government for remediation of cyanide pollution on the leased premises and on adjoining properties. PBM had operated a business engaged in the extraction of silver from x-ray film at the plaintiffs' property. The extraction process had involved cutting the film into chips, immersing the chips in sodium cyanide, and storing the chips in outdoor piles, dumpsters, and semi-trailers. The federal government had brought its action after cyanide-laced chips, over an extended period, scattered from the piles and from corroded dumpsters and trailers despite repeated requests by state and federal authorities for cleanup and disposal of the chips. The Wayne Circuit Court, James R. Chylinski, J., granted summary disposition for the plaintiffs, rejecting the defendant's cross-motion for summary disposition based on a policy exclusion for pollution that is not sudden and accidental. The defendant appealed.

The Court of Appeals *held:*

As used in the policy at issue, "sudden" means happening, coming, made or done quickly, without warning or unexpectedly; abrupt, and "accidental" means occurring unexpectedly and unintentionally; by chance. The undisputed facts indicate that the cyanide pollution was neither sudden nor accidental from the standpoint of the polluter. Accordingly, the trial court should have granted summary disposition for the defendant.

Reversed and remanded for entry of summary disposition for the defendant.

*Goodman, Eden, Millender & Bedrosian* (by *George J. Bedrosian*), for the plaintiffs.

*Mika, Meyers, Beckett & Jones* (by *Douglas A. Donnell* and *Linda L. Blais*), for the defendant.

Amicus Curiae:

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Bruce T. Wallace* and *William J. Stapleton*) (*Wiley, Rein & Fielding* by *Thomas W. Brunner, James J. Johnstone,* and *James P. Anasiewicz,* of Counsel), for Insurance Environmental Litigation Association.

Before: DOCTOROFF, C.J., and MICHAEL J. KELLY and GRIBBS, JJ.

DOCTOROFF, C.J. Plaintiffs, William and Phillipa Matakas, filed this action for declaratory judgment, seeking a determination that defendant, Citizens Mutual Insurance Company, owed a duty to defend and indemnify them for all costs and damages associated with environmental contamination and litigation arising out of pollution of their property in Romulus. Defendant, appeals from an order entered on November 20, 1990, declaring that it had a duty to defend and indemnify plaintiffs.[1] We reverse.

The facts surrounding the pollution of plaintiffs' property are not in dispute and are extracted, in large measure, from the United States Environmental Protection Agency on-scene coordinator's report prepared in conjunction with remediation pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (ERCLA). 42 USC 9601 *et seq.*

In January of 1983, PBM Enterprises commenced a lease with plaintiffs, the subject of which

[1] The Insurance Environmental Litigation Association has filed numerous briefs in support of defendant on behalf of some nineteen insurance companies throughout the country.

was the property at issue in this case. At all relevant times, plaintiffs' property was insured through a multiperil comprehensive general liability policy with defendant. PBM was in the business of extracting silver from x-ray film, using a sodium-cyanide solution as a wash. PBM cut the film into chips, which were then treated with the sodium-cyanide solution. After extracting the silver from the chips, PBM stored the chips on-site. Initially, the chips were stored inside the building on the property. However, when space was no longer available, PBM began storing the chips outside.

On May 14, 1983, a concerned citizen notified the Romulus police and the Michigan Department of Natural Resources that PBM was allowing the processed chips to accumulate on the property. On May 15, 1983, the Wayne County Air Pollution Control Department (WCAP) conducted an on-site investigation that revealed that wind had dispersed the chips throughout the property and onto an adjacent field. PBM was ordered to stop accumulating the chips, cover the pile, and obtain DNR and WCAP approval before moving the pile. On May 16, 1983, EPA officials received an anonymous phone call alerting them to the existence of the accumulated chips at the facility. Subsequently, DNR and WCAP officials met with the principals of PBM to discuss procedures to remediate the situation. On May 19, 1993, the principals of PBM were notified that the chips were considered reactive hazardous materials.

Because testing revealed that the chips contained hazardous waste properties in the form of high levels of cyanide contamination, PBM was ordered to take steps to convert its operations from a cyanide-based rinse to an enzyme-based rinse and to neutralize the cyanide-contaminated chips using a hypochlorite wash. PBM was further ordered to remove a puddle of discolored water

that had accumulated on the property, presumably because it was contaminated with cyanide. Subsequent inspections by the DNR revealed that PBM was attempting compliance and that about one fifth of the pile had been contained. Further, the Michigan Occupational Safety and Health Administration (MIOSHA) conducted inspections in August and October of 1983 and found no hazardous conditions on the property.

In November of 1983, principals of PBM requested that they be permitted to return to the cyanide-based rinse and proposed that they destroy the processed chips in an on-site incinerator, using the incinerator to heat the building. Although PBM was permitted to convert the process back to a cyanide-based rinse, incineration of chips or other materials on the property was forbidden. Having no place to store the processed chips, PBM again began allowing the cyanide-contaminated particles to accumulate on the property at alarming rates. PBM leased seventeen used semi-trailers and two "roll-off boxes" (construction dumpsters) for storage. The DNR, the WCAP, and the EPA again conducted routine sampling expeditions in January, February, and April of 1984, which revealed that the chips once again were hazardous.

On September 18, 1984, the EPA received an anonymous phone call indicating that PBM had begun to abandon the site and that the caller witnessed PBM release nearly six thousand gallons of preneutralized cyanide solution into the ground. Subsequent investigation indicated that PBM discharged substantial amounts of waste into the Wayne County sanitary sewer system without permission. In connection with this polluting activity and those described above, PBM was cited for various violations of the Resource Conservation and Recovery Act of 1976, 42 USC 6901 *et seq.*, and the Hazardous Waste Management Act, MCL 299.501

*et seq.*; MSA 13.30(1) *et seq.*[2] When PBM abandoned the site, it left behind 928,000 pounds of cyanide-laced film in corroded trailers and boxes. Some of the containers collapsed and spilled chips onto the ground, while others were left open, exposing the chips to precipitation.

On March 25, 1985, the EPA issued an administrative order pursuant to the provisions of the ERCLA (42 USC 9606[a]), naming the principals of PBM enterprises and plaintiffs as potentially responsible parties. The order directed PBM and plaintiffs to undertake certain duties to secure and clean up the site. In April 1985, after it became clear that the persons named in the administrative order were either unable or unwilling to assume responsibility for cleanup operations, the EPA began emergency response cleanup efforts. The operation consisted of two general phases: first, the site would be secured to prevent personal injury and further property damage and, second, remedial cleanup efforts would be conducted.

Before the first phase of the cleanup operation, warning signs were posted on the property regarding the hazards present on the site and Mr. Matakas arranged for temporary fencing to seal off the contaminated area. Mr. Matakas also undertook certain remedial actions at that time, including the removal of debris that had accumulated in the affected area. Phase two of the operation began about April 19, 1985, and involved on-site neutralization of the material before its removal from the site. Cleanup operations were concluded in October of 1985, but not before several equipment failures

[2] PBM was cited, in part, for operation of a hazardous waste storage facility without a permit, failure to maintain the facility in such a manner as to prevent releases of hazardous waste, failure to store hazardous waste in safe containers, failure to properly mark and label hazardous waste, and various personnel training and record-keeping violations.

and accidents delayed the project and drove up the total cost of the operation from an estimated "worst case" cost of $400,000, to a final figure of just over $800,000.

In August of 1988, nearly three years after the EPA began cleanup operations, Mr. Matakas filed a claim with defendant regarding the contamination and costs involved in the cleanup. On October 7, 1988, the federal government filed suit against PBM, its principals, and plaintiffs in the United States District Court for the Eastern District of Michigan, Southern Division.[3] Plaintiffs tendered defense of the suit to defendant. Defendant declined to defend the action in a letter on November 9, 1988. Thereafter, plaintiffs filed the instant action for declaratory judgment in the Wayne Circuit Court together with a motion for summary disposition with regard to the question whether defendant owed plaintiffs a duty to defend them in the underlying federal suit. Defendant also moved for summary disposition, arguing that it had no duty to defend for a number of reasons.

Initially, a hearing was conducted on the summary disposition motions before Judge William L. Cahalan. Judge Cahalan ruled that defendant had a duty to defend plaintiffs in the federal suit, but reserved ruling on the indemnification issue pending further factual development. Subsequently, Judge Cahalan ruled that the question whether plaintiffs expected the pollution was a question of fact. Judge Cahalan also summarily concluded that cleanup costs were "damages" as defined in the policy and that the damages extended beyond the property of plaintiffs, thereby surviving the "owned-property" exclusion. Judge Cahalan ruled that, even though there remained questions of fact

---

[3] Representations by the parties at oral argument were that the federal case has been disposed of apparently pursuant to a settlement.

regarding the "occurrence" clause, defendant had a duty to defend plaintiffs in the federal action. Before an order could be entered reflecting these rulings, Judge Cahalan passed away and was replaced by Judge James R. Chylinski.

Plaintiffs petitioned Judge Chylinski for entry of an order granting summary disposition of all issues, including the duty to indemnify. The order was entered as requested. Defendant claimed that the order was entered before it had an opportunity to respond with objections and, thus, violated the provisions of MCR 2.602. Defendant filed a motion to vacate the order and raised its procedural and substantive objections in the motion. Defendant then stated its objections on the record at a hearing before Judge Chylinski. Thereafter, Judge Chylinski issued an opinion and order granting summary disposition in favor of plaintiffs on all issues, including the duty to defend and indemnify. It is from this November 20, 1990, order that defendant now appeals.

On appeal, defendant raises a number of issues. However, because we conclude that the pollution-exclusion clause precludes coverage as a matter of law, we reverse the order of the trial court and decline to address the remaining issues raised by defendant.[4] Implicit in our treatment of this matter is the assumption that there was an "occurrence" as that term is defined in the policy.

The policy at issue contains traditional language excluding coverage for pollution activities. The exclusion provides that coverage does not apply

to bodily injury or property damage arising out of

[4] We note that our Supreme Court declined to address many of the same issues in *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 201 and n 1; 476 NW2d 392 (1991), because it found the pollution-exclusion clause to be dispositive. See also *FL Aerospace v Aetna Casualty & Surety Co,* 897 F2d 214, 215 (CA 6, 1990).

the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The provision generally excludes coverage for pollution activity that fits within the description in the clause. However, the exception to the pollution exclusion states that the "exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." See *Protective Nat'l Ins Co of Omaha v Woodhaven,* 438 Mich 154, 161; 476 NW2d 374 (1991); *Polkow v Citizens Ins Co of America,* 438 Mich 174, 179; 476 NW2d 382 (1991); *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 206; 476 NW2d 392 (1991) (referred to collectively herein as the *Polkow* trilogy).

In determining whether the "sudden and accidental" exception to the pollution-exclusion clause applies in this case, we must return to the fundamental rules of contract interpretation. Our Supreme Court recently revisited those concepts in the process of interpreting the "sudden and accidental" exception:

"Initially, in determining whether a policy applies, we first must determine whether the policy is clear and unambiguous on its face." *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656, 665; 443 NW2d 734 (1989) (opinion of RILEY, C.J.). We cannot create an ambiguity where none exists. *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co,* 375 Mich 598; 134 NW2d 746 (1965). Similarly, we reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation.

> Rather, we enforce the terms of the contract as written. *Eghotz v Creech,* 365 Mich 527, 530; 113 NW2d 815 (1962). If the language of the policy is unambiguous, it must be considered "in its plain and easily understood sense." [*DiCicco, supra,*] 432 Mich 710. See *Wertman v Michigan Mutual Liability Co,* 267 Mich 508, 510; 255 NW 418 (1934). [*Upjohn, supra* at 206-207.]

An insurance contract is clear if it fairly admits of but one interpretation. *Farm Bureau Mutual Ins Co of Michigan v Stark,* 437 Mich 175, 181-182; 468 NW2d 498 (1991) (quoting *Raska v Farm Bureau Ins Co,* 412 Mich 355, 361-362; 314 NW2d 440 [1982]).

A motion for summary disposition pursuant to MCR 2.116(C)(10) is designed to test the factual sufficiency of a claim. *Radtke v Everett,* 442 Mich 368, 374; 501 NW2d 155 (1993). A court reviewing such a motion must consider the pleadings, affidavits, depositions, admissions, and any other evidence in favor of the nonmoving party and grant the benefit of any reasonable doubt to that party. *Id.* This Court is obligated to consider those facts in a light most favorable to the nonmoving party. *Id.* Because we have concluded that summary disposition pursuant to MCR 2.116(C)(10) should have been granted in defendant's favor, we are viewing the facts herein in a light most favorable to plaintiffs to determine whether factual issues regarding the pollution exclusion exist.

In view of the recent decisions by our Supreme Court in the *Polkow* trilogy, it is clear that the trial court erred in granting summary disposition in plaintiffs' favor; it should have granted summary disposition to defendant. While it is true that coverage is mandated where an "occurrence" takes place, we construe the pollution exclusion as a limitation on what types of pollution occurrences

are covered. See *Liberty Mutual Ins Co v Triangle Industries, Inc,* 957 F2d 1153, 1158, 1160 (CA 4, 1992).

Pursuant to *Upjohn,* where the discharge is anything but sudden and accidental the pollution-exclusion clause will preclude coverage. The Court expressly overruled the then-prevailing view as expressed by this Court in *Jonesville Products, Inc v Transamerica Ins Group,* 156 Mich App 508, 512; 402 NW2d 46 (1986), which concluded that even a continuous discharge of materials could be both sudden and accidental. *Upjohn, supra* at 208.[5] Our Supreme Court, following the direction of the United States Court of Appeals for the Sixth Circuit, held that the terms were unambiguous and that they did not encompass the definition expressed by this Court in *Jonesville. Upjohn, supra* at 207-208 (relying on *United States Fidelity & Guaranty Co v Star Fire Coals, Inc,* 856 F2d 31 [CA 6, 1988]; *United States Fidelity & Guaranty Co v Murray Ohio Mfg Co,* 875 F2d 868 [CA 6, 1989]; *FL Aerospace v Aetna Casualty & Surety Co,* 897 F2d 214 [CA 6, 1990]).

The *Upjohn* Court defined the terms "sudden and accidental" as follows:

> We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." *Star Fire Coals, supra* at 34. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace, supra* at 219. "Accidental" means "[o]ccur-

---

[5] In this case, part of the error resulted from the trial court's reliance upon the then-prevailing definition of "sudden and accidental" as articulated in *Jonesville.* In *Jonesville,* this Court equated the term "sudden" with unexpected and "accidental" with unintended. See *Jonesville, supra* at 512.

ring unexpectedly and unintentionally; by chance." *The American Heritage Dictionary: Second College Edition,* p 72. [*Upjohn, supra* at 207-208. See also *Grant-Southern Iron & Metal Co v CNA Ins Co,* 905 F2d 954, 956-957 (CA 6, 1990).]

The instant case concerns an interpretation of these terms and is controlled by the definitions agreed upon by a majority of our Supreme Court.

In the instant case, we are confronted with an extension of the pollution-exclusion issue from the actual polluter to potentially responsible parties that are merely designated as such because of their status as owners of the contaminated property. Defendant argues that the status of the insured should not be dispositive when interpreting the clear policy language. On the other hand, plaintiffs claim that the policy language must be construed to imply that the "sudden and accidental" exception to the pollution exclusion applies where the owners are unaware of the pollution activity caused by a tenant of the property. We conclude that to interpret the policy as plaintiffs suggest would be to rewrite the "sudden and accidental" exception.

We have thoroughly examined the *Upjohn* opinion and have been unable to find any link between the insured's construction of the pollution-exclusion clause and the definition of "sudden and accidental." Rather, the focal point of the inquiry is whether the release was "sudden and accidental" from the standpoint of the polluter.[6] In fact,

---

[6] We are persuaded that the *Upjohn* Court would have reached the same result had Upjohn merely owned the property and leased it to an entity that was ultimately responsible for the release. The entire analysis of the "sudden and accidental" exception in *Upjohn* focused on Upjohn as a polluter rather than as an insured. It was merely fortuitous that Upjohn was both the polluter and the insured under the facts of that case.

without exception, each time the terms are construed, they are done so with reference to discharge, dispersal, release, or escape. See also *Ray Industries, Inc v Liberty Mutual Ins Co,* 974 F2d 754, 767 (CA 6, 1992); *FL Aerospace, supra* at 220. The *Upjohn* Court stated that "[t]he pollution exclusion does not apply to *releases* which are 'sudden and accidental.'" *Upjohn, supra* at 206 (emphasis added).

In applying the term "sudden" to the *Upjohn* case, the Court focused entirely on the release of the material rather than upon the insured's intent or knowledge. *Id.* at 209-210. See also *Protective Nat'l, supra* at 162 ("It is clear that the discharge, dispersal, release, or escape to which both the exclusion and the exception refer is the initial discharge, dispersal, release, or escape *into* the atmosphere and not the subsequent migration."). In response to Justice Levin's dissent, the Court stated:

> [F]or something to be sudden, it must be *both* immediate *and* unexpected. Since, under the facts of this case, the release of by-product was not unexpected by Upjohn, it is consistent for the majority to state that the release cannot possibly be viewed as "sudden." [*Upjohn, supra* at 210, n 9; emphasis in original.]

Moreover, the actual language of the clause at issue in this case unambiguously links the terms "sudden and accidental" with the release as opposed to the knowledge, intent, or expectation of the insured. Accordingly, any attempt by this Court to focus exclusively on the intent of the insured in interpreting the "sudden and accidental" exception would be to distort and effectively rewrite the terms of the policy: an act expressly

forbidden in the construction of insurance contracts.[7] See *id.* at 207.

Turning to the facts of this case, in order to avert summary disposition in regard to the pollution exclusion, there must be no genuine issue of material fact regarding whether the release was "sudden and accidental." If there is no factual dispute that the release occurred over a period of time as opposed to "happening, coming, made or done quickly, without warning or unexpectedly; abrupt," then the release is, by definition, not sudden. See *id.* Moreover, if there is no factual dispute that the release was intentional and expected as opposed to "[o]ccurring unexpectedly and unintentionally; by chance," then the release is, by definition, not accidental. *Id.* at 207-208. In order to avoid application of the pollution exclusion, the release must be *both* sudden and accidental. See *New York v AMRO Realty Corp,* 936 F2d 1420 (CA 2, 1991).

In the instant case, the undisputed facts suggest that the release of the pollutants that mandated the EPA response was occurring over a period of time, with warning, and fully expected from the standpoint of the polluters. PBM began stockpiling contaminated chips as soon as it took occupancy in early 1983. The deposition of William Oakley revealed that the entire building had been filled with chips before he was instructed to stockpile

---

[7] We of course recognize that the intent of the insured may be relevant to the question whether the release was accidental where the insured is the actual polluter. See *Upjohn, supra* at 207, 211-213 (concluding that Upjohn had sufficient knowledge to expect that a leak had occurred, thereby making the release expected and intentional). By definition, a party that expects or intends the release or discharge to occur cannot argue that it was "sudden and accidental." See *id.* at 216 and n 15; *Protective Nat'l, supra* at 161. However, where, as here, the polluter is a tenant of the insured, the focus shifts to the expectations of the tenant in determining whether the "sudden and accidental" exception applies.

the chips on the property outside. Oakley's testimony further revealed that the process produced nearly two thousand pounds of chips a day. The initial response report prepared by the Romulus police indicated that the WCAP investigator estimated the pile of discarded chips to be six feet high and some eighty feet in length. Even after the DNR and the EPA ordered PBM to find safe alternatives for disposal of the chips, PBM apparently continued to discard the material, knowing full well of its hazardous properties.

Oakley further testified in deposition that he was instructed to lease trailer trucks and roll-off boxes to store the chips on-site.[8] Reference was made during the Oakley deposition to a letter from a DNR official to one of PBM's principals indicating that the trailer trucks were leaking and, as such, constituted an unacceptable method of disposal. Oakley also admitted that the stockpiled chips were visible and, at times, open to the elements. In fact, Oakley stated that there was a runoff from the trailers that amounted to a "steady drip." Even after the EPA and the DNR had advised PBM and its employees of the dangerous characteristics of the chips, the trailers were allowed to corrode and collapse, spilling chips onto the ground. When PBM abandoned the site, it *left* over 928,000 pounds of chips in numerous leaking trailers, boxes, and piles scattered about the property.

Considering the above activity in light of the recently clarified interpretation of the "sudden

---

[8] In Mr. Matakas' affidavit, he asserts that the trailers were approved by DNR officials as a method of temporary storage. Even were we to consider that as true (which we are obligated to do given the posture of this case), we cannot envision the DNR approving trailers that leaked. Moreover, the undisputed evidence indicated that the chips stored in the trailers were at least partially contaminated with cyanide. This is in direct contravention of the DNR and EPA order to neutralize all chips before storage.

and accidental" exception to the pollution exclusion, we are persuaded that there exists no genuine issue of material fact that the coverage is precluded by the pollution exclusion. Considering the acts in a light most favorable to plaintiffs, under no circumstances could the above-described activity be considered "sudden" or "accidental." The polluting activity began in May of 1983, stopped when EPA and DNR officials advised of the danger to the environment, and began again, continuing for a sufficient period of time to allow a vast amount of chips to accumulate on the property and to allow corrosion of the storage receptacles. This activity cannot be considered "happening, coming, made or done quickly, without warning" as it must to satisfy the definition of "sudden" as established in *Upjohn.* Nor can this activity be considered to have occurred "unexpectedly and unintentionally" from the standpoint of the polluter as required to fit the established definition of "accidental."

Any reference to the insureds' expectations of the release or injury to the property, regardless of whether they were the actual polluters, is not dispositive when faced with the task of evaluating the pollution-exclusion clause. While it may be relevant for the purposes of determining whether an "occurrence" has taken place, see *Arco Industries Corp v American Motorists Ins Co,* 198 Mich App 347, 351-352; 497 NW2d 190 (1993), the inquiry does not end there and the terms from the "occurrence" clause are not synonymous with the terms of the pollution-exclusion clause. Our reading of the policy is that the two clauses are mutually exclusive and in order for coverage to be provided there must be both an "occurrence" and a "sudden and accidental" release so as to escape

application of the pollution-exclusion clause. See *Liberty,* 957 F2d 1160.

We recognize that under this construction of the policy harsh results may obtain. This is particularly so where there is a truly innocent landowner who knows nothing of the polluting activities of a tenant or trespasser. However, we are bound by the plain meaning of the policy and the precedent cited above. Having concluded that no coverage is intended in this case, we need not address the remaining issues raised by defendant.

Reversed and remanded for entry of judgment in favor of defendant.