ALTICOR, INC., Amway Corp., and Quixtar, Inc., Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE CO. OF PENNSYLVANIA, Defendant.

No. 1:07–cv–1079.

United States District Court, W.D. Michigan, Southern Division.

Jan. 4, 2013.

D. Andrew Portinga, Thomas R. Wurst, Miller Johnson PLC, Grand Rapids, MI, for Plaintiffs.

Charles W. Browning, Jeffrey C. Gerish, Plunkett Cooney, Bloomfield Hills, MI, for Defendant.

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S CONTINGENT MOTION FOR PARTIAL SUMMARY JUDGMENT

PAUL L. MALONEY, Chief Judge.

In this lawsuit, the Plaintiffs seek insurance coverage under a specific policy that was in effect between 1998 and 1999. Before this Court are three motions for summary judgment.[1] Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union" or "Defendant") filed a motion for summary judgment and brief in support.[2] (ECF. No. 26 "Defendant's Motion" and ECF No. 32 "Defendant's Brief.") Plaintiffs Alticor, Inc., Amway Corp., and Quixtar, Inc. (collectively "Plaintiffs") filed a cross motion for summary judgment and a brief in support.[3] (ECF. No. 28 "Plaintiffs' Motion." and ECF No. 33 "Plaintiffs' Brief.") National Union also filed a contingent motion for partial summary judgment and supporting brief.[4] (ECF No. 31 "Contingent Motion" and ECF No. 32 "Contingent Brief.") National Union requests the Court resolve the Contingent Motion only in the event that it is necessary, which depends on the outcome of the first two motions for summary judg-

ment. A hearing on the three motions was held on November 20, 2012.

The ultimate issue underlying this litigation and these motions is whether, under the 1998–1999 Commercial General Liability policy issued by National Union to Amway, National Union has a duty to defend Amway on the basis of an amended complaint filed in 2006 in a lawsuit in the United States District Court for the Western District of Missouri. The Court finds National Union's duty to defend was triggered.

### LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Tucker v. Tennessee,* 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. Fed.R.Civ.P. 56(c)(1); *Bennett v. City of Eastpointe,* 410 F.3d 810, 817 (6th Cir.2005) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct.

---

1. All briefs and supporting exhibits have been filed under seal. Most of the documents have not been uploaded into the Court's CM–ECF system. Where possible, the CM–ECF page identification number ("PgID") has been used for reference.

2. Plaintiffs filed a response. (ECF No. 44 "Plaintiffs' Response.") National Union filed a reply. (ECF No. 51 "Defendant's Reply.")

3. National Union filed a response. (ECF No. 42 "Defendant's Response.") Plaintiffs filed a reply. (ECF No. 52 "Plaintiffs' Reply.")

4. Plaintiffs filed a response to the contingent motion. (ECF No. 43 "Contingent Response.") National Union filed a reply. (ECF No. 50 "Contingent Reply.")

2505, 91 L.Ed.2d 202 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial. *Matsushita*, 475 U.S. at 574, 106 S.Ct. 1348; *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) ("After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.' " (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505)). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505.

## FACTUAL BACKGROUND

The following facts are not in dispute and find support in the record or in relevant litigation history. On August 5, 2003, Plaintiffs were sued in the United States District Court for the Western District of Missouri. *See Nitro Distrib., Inc. v. Alticor, Inc., Amway Corp., and Quixtar, Inc.*, No. 03–3290–cv–RED (W.D.Mo.) ("*Nitro*"). As a result of the *Nitro* action, coverage was requested under a Commercial General Liability ("CGL") policy, and was declined.[5] On January 6, 2005, National Union and Illinois National Insurance Company ("Illinois National") filed

suit in this district seeking a declaratory judgment that they had no obligation to provide coverage in the *Nitro* action.[6] *See National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.*, No. 1:05–cv–15, 2005 WL 2206461 (W.D.Mich.) (Enslen S.J.) ("*Alticor I* "). Among the factual allegations in the *Nitro* lawsuit, the plaintiffs alleged that the defendants "disparaged" them.[7] (Defendant's Brief. Ex. I "*Nitro* Complaint.") On cross summary judgment motions, Judge Richard Enslen found that the disparagement allegation did not trigger coverage under the personal or advertising injury provisions of the insurance policies. *Alticor I*, 2005 WL 2206461, at *3 (W.D.Mich. Sept. 12, 2005). Judge Enslen concluded that the disparagement allegation was made in the context of the lawsuit's antitrust claims brought under the Sherman Act, and did not "even arguably" allege a separate claim for libel, slander, or product disparagement. *Id.* The defendants appealed.

Approximately one year later, on September 5, 2006, the plaintiffs in the *Nitro* action filed an amended complaint. (ECF No. 1–2 Ex. A to Compl. "*Nitro* Amended Complaint.") The *Nitro* Amended Complaint added a claim for injurious falsehood. (*Id.* ¶¶ 216–22.) The relevant portions of the amended complaint, referring to the injurious falsehood allegations, are included here.

108. The involvement of Amway in BSMs with the kingpins as part of this ongoing conspiracy is further amply il-

---

5. National Union asserts, without evidence, that Amway tendered the initial *Nitro* complaint to AIG. (Defendant's Brief 7.) Plaintiffs, on the other hand, contend, also without evidence, that Alticor tendered the initial *Nitro* complaint to National Union. (Plaintiffs' Brief 4.) This factual dispute is not material to the resolution of the motions.

6. As will be explained in more detail later, the CGL policies were issued on an annual basis.

Prior to April 2002, the policies were issued by National Union. After April 2002, the polices were issued by Illinois National.

7. The complaint alleged six claims: (1) antitrust violation—group boycott, (2) antitrust violation—allocation of customers, (3) antitrust violation—illegal tying arrangement, (4) antitrust violation—conspiracy to monopolize, (5) tortious interference, and (6) civil conspiracy. (*Nitro* Compl.)

lustrated in dealings with Team In Focus. In mid–2000, a group of Amway Diamond distributors in the Yager/Gooch/Childers Amway line of sponsorship met in Chicago to address their common concern about the tool system and the abuses and inequities they had experienced as tool distributors in the Gooch Pro Net Pyramid. These distributors ultimately decided to form what became known as Team In Focus ("TIF"), and essentially break away from Gooch. Thus this breakaway would create yet another tool system or pyramid, and once again, Amway was involved.

118. Thereafter, on knowledge and belief, the Amway kingpins and the IBOIAI Board applied pressure on Amway who recanted, withdrawing its support of TIF, including its commitment to supply tools.

122. Ultimately, on April 19, 2002, after TIF attempted to implement its own tool "system" for its downline distributors and compete directly with Amway and the kingspins for BSMs, Amway terminated the Amway distributorships of the TIF leadership principals for purported "antitrust violations' in setting up their own tool systems. Other TIF founders thereafter resigned their distributorships with Amway in protest. Amway then forced the dispute into its arbitration process before JAMS, and that is where it ended, shrouded in secrecy. The TIF distributors were out of Amway and out of the Amway-related tool business. Because the TIF distributors should have been Nitro, West Palm and U–Can–II's BSMs customers, those Plaintiffs were also harmed.

128. About this same time (fall 2002), Quixtar responded to the requests of the principal Diamonds of Plaintiffs Nitro, West Palm (Stewart) and U–Can–II (Harts) to be permitted to resume leadership of their downlines in the Amway business (after being boycotted out of the tool and function business), so as to enable Plaintiffs to attempt to resume their participation in functions and thus access tool sales as well. In letter of October 25, 2002, Quixtar stated:

> "[we] have determined at this time, allowing you to service the downline would not be in the best interest of the involved IBOs, Quixtar or the Quixtar business . . . Furthermore, as a result of the current dispute between you and the other IBOs, it is difficult for us to imagine how you could be qualified to bring the requisite harmony, leadership and teamwork that these groups will require. While no one disputes your right to seek redress for your concerns, the manner in which you have chosen to do so has resulted in a very public and acrimonious airing of this dispute.

The "dispute" refers to a dispute of BSMs. The "very public and acrimonious airing of this dispute" refers to the Plaintiffs' refusal to submit to the inherently biased Amway arbitration process with JAMS, which this Court has now found to be unenforceable. Ironically, Ken Stewart of Nitro and West Palm remains an Amway "qualified Diamond," yet Amway has made sure he is kept out of any meaningful involvement in the training and motivation of distributors via the BSMs business. By keeping them on the sidelines of the business, Amway could ensure that Stewart and the Harts could not re-engage and compete for BSMs through their BSMs companies—the Plaintiffs herein. Again, Amway perpetuated this boycott and facilitated control of the tool business.

134. Once a distributorship was viewed by the conspirators in an unfavorable way, as were these Plaintiffs, usually following that distributor's asser-

tion of a position or right Amway or the kingpins did not like, an effort to compete for BSMs, or simply a desire to take their business, the following typically transpired:

(a) They "trashed" the grievant distributor by spreading falsehoods, for example: "He is not committed to the business"; "he is not committed to his downline"; "he won't pay you what you're entitled"; "he is too religious"; "he is a rogue"; "he is inactive"; "he is not interested in providing you with leadership"; and "he doesn't care about you or the business." This was intended to drive a wedge between the distributor and his downline. This happened to the Plaintiffs and their principals who were the targets and the victims of these falsehoods. Of course, those driving the wedge were the very ones the grievant had long "edified," per the Amway culture, so when those who had been "edified" criticized the grievant, it carried credibility.

### COUNT VI
#### *Injurious Falsehood*

COME NOW the Plaintiffs, and for their additional cause of action against Defendants, further state and allege as follows:

216. In the course of the conspiracy, the Defendants represented to their downline distributors that each Plaintiff was "inactive" and not interested or willing to take an active leadership role in the training and motivation of their related downline distributors, which training and motivation, of course, was accomplished via tools and functions in the Amway-related BSMs business. Defendants further represented to others that the Plaintiffs and/or their principals were not capable of providing effective leadership in training and motivating their downline by reason of one or more

falsehoods, as enumerated in ¶¶ 128 and 134 above.

217. Stated differently, having participated in forcing the Plaintiffs out of the BSMs business involuntarily, the Defendants then tried to "spin" their disengagement in the training and motivation process (the BSMs business) as the voluntary act or choice of each Plaintiff, and disparaged them again and again.

218. The absence of Plaintiffs' leadership in the training and motivation process prompted inquiries to Amway by the Plaintiffs' BSMs customers.

219. Defendants' representations that Plaintiffs were "inactive," as well as related statements that this was due to the Plaintiffs' own volition, and were patently false, defamatory and injurious, and Defendants knew them to be such at the time, or at the very least, made such falsehoods in reckless disregard for their truth or falsity. These injurious falsehoods were of and concerning each Plaintiff, its trade, and its inability to conduct trade within the Amway-related BSMs business.

220. Defendants were at fault in publishing these injurious falsehoods to others, and it was reasonably foreseeable that others would rely on the falsehoods and consider them injurious to Plaintiffs.

221. As a direct result of the Defendant's acts and falsehoods in this respect, Plaintiffs and each of them have been damaged, suffering pecuniary loss, and their damages are millions of dollars.

222. The conduct of the Defendants, as herein described, was outrageous because of their evil motive or reckless indifference to the rights of others.

(*Nitro* Amended Compl.)

On the basis of the amended complaint, the defendants in the prior suit in this

district, Plaintiffs here, filed a motion for relief in *Alticor I*, asserting that the amended complaint constituted new evidence. The court denied the motion, holding that the amended complaint did not constitute newly discovered evidence. *Id.*, 2006 WL 3091458, at *1 (W.D.Mich. Oct.30, 2006). The defendants appealed.

The Sixth Circuit Court of Appeals consolidated the two appeals. *National Union Fire Ins. Co. of Pittsburgh v. Alticor, Inc.*, No. 05–2479 and 06–2538, 2007 WL 2733336 (6th Cir. Sept. 17, 2007) (per curiam) (*"Alticor II"*). In the opinion, the Sixth Circuit stated that the amended complaint

> included most of the allegations in the original 2003 complaint but also added a count alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and another count specifically alleging "injurious falsehood," a claim ostensibly—and neatly—falling within the insurance policies' duty-to-defend provisions.

*Id.*, at *4. The Sixth Circuit affirmed both of the trial court's orders. *Id.*, at *9.

Based on the amended complaint, coverage was again requested in the *Nitro* action.[8] On December 19, 2006, a representative of American International Group ("AIG") Insurance Services, on behalf of National Union and Illinois National, issued a response to Plaintiffs' request for coverage.[9] (ECF No. 1–3 Ex. B to Compl. "AIG Letter" PgID 2–11.) Illinois National agreed to defend Plaintiffs under the policy effective from April 1, 2002, through April 1, 2003, and under the policy effective from April 1, 2003, through April 1, 2004. (*Id.* PgID 2.) National Union, however, declined to provide insurance coverage. (*Id.*) Referencing the relevant paragraphs in the *Nitro* Amended Complaint, AIG concluded that "the alleged instances of injurious falsehood are alleged to have occurred no earlier than April 2002." (*Id.* PgID 5.)

Meanwhile, discovery occurred in the *Nitro* action on the amended complaint. The defendants there, Plaintiffs here, received answers to interrogatories from the *Nitro* plaintiffs. After receiving the AIG Letter of December 19, 2006, Plaintiffs sent a second letter to AIG, on January 19, 2007, attaching relevant discovery responses. (ECF No. 1–4 Ex. C to Compl. "Response Letter" PgID 87–91.) Based on the answers to the interrogatories, Plaintiffs contended that the allegedly false

8. Plaintiffs assert Alticor submitted the amended complaint to National Union seeking coverage, but have provided no evidence to support this assertion. (Plaintiffs' Brief 6.) National Union asserts Amway tendered the amended complaint to AIG, but did not identify the policy under which coverage was triggered. National Union references a letter—written on paper with the Alticor letterhead and logo—to AIG dated October 2, 2006. (Ex. H to Defendant's Brief "Coverage Request Letter.") The entirety of the letter reads, "We received your response dated September 29, 2003 with regard to Nitro vs. Alticor et al. litigation. We reserve our rights with regard to this matter and attach for notice the Amended Complaint which was filed on September 25, 2006." (*Id.*) Whether Amway or Alticor tendered the amended com-plaint is not material to the resolution of these motions. Whether the amended complaint was tendered to AIG or National Union is also not a material dispute.

9. The record is not clear as to the relationship between AIG, National Union, and Illinois National. National Union states AIG "represents National Union and Illinois National." (Defendant's Brief 7.) Plaintiffs contend "National Union and Illinois National are AIG companies." (Plaintiffs' Brief 6 n. 2.) Neither party provides documentation for the assertions. Neither party has argued that the relationship between these three companies is relevant to any material fact. Neither AIG nor Illinois National are parties to this lawsuit.

statements were made as early as 1998. (*Id.* at 2 PgID 88.) As its first interrogatory, Alticor asked the *Nitro* plaintiffs to identify the false statement allegedly made and to identify the individual who made the statement and when the statement was made.[10] (ECF No. 1–6 Ex. C2 to Compl. "Answers to Alticor Interrogatories" PgID 15.) In response, the plaintiffs in the *Nitro* action named individuals who made the allegedly false statements, and included in that list "Defendants." (*Id.* PgID 16.) The Nitro plaintiffs stated that they "believe such statements increased in frequency during 1998/1999...." (*Id.*)

By letter dated February 15, 2007, the denial of coverage under the 98/99 policy was confirmed. (Plaintiffs' Brief Ex. 6 "Denial Letter.") The letter provided three reasons why National Union would not cover Plaintiffs under the 98/99 policy. First, the letter stated that "[i]t is the complaint against the insured, not an underlying plaintiff's discovery responses, that determines whether an insured owes a duty to defend its insured against allegations in an underlying complaint." (*Id.* at 2.) Second, after reviewing the interrogatory responses, "they do not demonstrate that the injurious falsehood claim is based on events that occurred in 1998." (*Id.*) Finally, the policy exclusions would preclude coverage because "the underlying plaintiffs assert that the statements were made with knowledge of their falsity or a reckless disregard for the truth precisely because the Defendants and co-conspirators know them to be false." (*Id.*)

With all of this information, Plaintiffs filed this lawsuit against National Union seeking coverage of the *Nitro* action under the 1998–1999 CGL issued by National Union.

---

**10.** Each of the defendants in the *Nitro* action, Plaintiffs here, submitted separate interrogatories.

# LAW

## A. Application of State Law

 This action comes to federal court on the basis of diversity of the parties. In diversity suits, federal courts apply the substantive law of the forum state. *Cen-Tra, Inc. v. Estrin,* 538 F.3d 402, 409 (6th Cir.2008) (citing *Himmel v. Ford Motor Co.,* 342 F.3d 593, 598 (6th Cir.2003)). This rule applies to actions arising from disputes over insurance contracts. *Talley v. State Farm Fire and Cas. Co.,* 223 F.3d 323, 326 (6th Cir.2000). As this Court sits in Michigan, Michigan law governs the resolution of the dispute.

 When applying state law to a diversity action, the federal court "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley,* 223 F.3d at 326. Where the state's supreme court has not weighed in on the issue, federal courts must anticipate how the state's supreme court would rule by considering "all available data, including the decisional law of the state's lower courts." *Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 517 (6th Cir.2001). " 'Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' This rule applies regardless of whether the appellate court decision is published or unpublished." *Id.* (citations omitted).

## B. Michigan Insurance Law

 The Michigan Supreme Court has provided guidelines for how courts should interpret insurance policies.

We hold, first, that insurance policies are subject to the same contract construction principles that apply to any other species of contract. Second, unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written. We reiterate that the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of "reasonableness" as a basis upon which courts may refuse to enforce unambiguous contractual provisions.

*Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 461, 703 N.W.2d 23 (2005). A court should begin by reviewing the contract to "determine what the agreement was and effectuate the intent of the parties." *Auto–Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431 (1992). "[T]he court must look at the contract as a whole and give meaning to all terms." *Id.* "Terms in an insurance policy either are clearly defined within the policy or are given their commonly used meanings." *Grp. Ins. Co. of Michigan v. Czopek*, 440 Mich. 590, 596, 489 N.W.2d 444 (1992) (citation omitted). That a policy does not define a word or phrase does not create an ambiguity within the policy. *Id.* When determining whether an insurance provision applies, a court "first must determine whether the policy is clear and unambiguous on its face." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 206, 476 N.W.2d 392 (1991) (quoting *Metro. Prop. & Liab. Ins. Co. v. DiCicco*, 432 Mich. 656, 665, 443 N.W.2d 734 (1989)). "Where the policy is clear, [ ], 'courts are bound by the specific language set forth in the agreement.'" *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 160, 534 N.W.2d 502 (1995) ("*Heniser*").

The proper interpretation of a contract, and the legal effect of contractual provisions, are questions of law. *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 366–67, 817 N.W.2d 504 (2012).

■■■ When deciding whether an insured is entitled to coverage, Michigan courts employ a two-step process. *Heniser*, 449 Mich. at 172, 534 N.W.2d 502. First, the court must determine whether the policy provides coverage for the insured. *Id.* The insured bears the burden of establishing that the claims falls within the terms of the policy. *Id.* (citations omitted). Second, the court must determine whether the coverage is negated by any exclusion in the policy. *Id.* The insurer bears the burden of establishing that an exclusion applies. *Id.* at 161 n. 6, 534 N.W.2d 502.

## C. Missouri Law

■■■ Because the underlying lawsuit over which coverage is disputed was filed in Missouri, Missouri law governs the causes of action in the *Nitro* lawsuit. Missouri recognizes the tort of injurious falsehood. *Lau v. Pugh*, 299 S.W.3d 740, 749 (Mo.Ct.App.2009) (citing *State ex rel. BP Prods. North America, Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo.Ct.App.2005) and *Annbar Assocs. v. American Express Co.*, 565 S.W.2d 701, 706 (Mo.Ct.App.1978)). To establish a claim for injurious falsehood, a plaintiff must show that the defendant published a false statement that was harmful to the defendant and caused pecuniary loss, and the defendant intended for the publication to cause harm or recognized that the publication would do so and also knew the statement was false or acted in reckless disregard of its truth or falsity. *Ross*, 163 S.W.3d at 928.

■■■ Under Missouri law, a civil conspiracy is "an agreement or understanding between at least two persons to

do an unlawful act, or to use unlawful means to do an act that would otherwise be lawful." *Roth v. La Societe Anonyme Turbomeca France*, 120 S.W.3d 764, 777 (Mo.Ct.App.2003) (citation omitted). However, a civil conspiracy "is not actionable in its own right because it does not exist apart from the statement of the underlying claim. The unlawful acts done in pursuit of the conspiracy give rise to the action. Proving the conspiracy concerns only the co-conspirators' liability as *joint tortfeasors*." *Id.* at 777–78 (internal citations and citations omitted); *see Greene v. Schneider*, 372 S.W.3d 887, 890 (Mo.Ct.App.2012) ("Strictly speaking, the fact of the conspiracy is not actionable, but the action sounds in tort and is in the nature of an action on the cause upon the wrong done under the conspiracy alleged. In other words, a conspiracy does not give rise to a civil action unless something is done pursuant to which, absent the conspiracy, would create a right of action against one of the conspirators.") (quotation marks omitted) (citing *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo.Ct.App.2008)).

## INSURANCE POLICES

When determining coverage under an insurance policy, the court starts with the language of the policy. National Union issued annual CGL insurance policies to at least one of the three Plaintiffs between 1991 to 2002. (Plaintiffs' Brief at 2; Defendant's Brief at 3.) *See Alticor I*, at *1. Without dispute, National Union issued an insurance policy, RM GL 113–54–67, to Amway effective November 1, 1997, through November 1, 1998. (Plaintiffs' Response Ex. B). Also without dispute, National Union issued a insurance policy, RM GL 612–23–20, to Amway effective from November 1, 1998, through November 1, 1999. (Defendant's Brief Ex. A "98/99 Policy") The 98/99 Policy included

"personal and advertising injury liability" under Section I—Coverages, Coverage B. (*Id.* AIG POL 831.)[11]

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages....

\* \* \*

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed during the "coverage territory" during the policy period.

2. Exclusions

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(*Id.*) The 98/99 Policy provides definitions for certain terms in Section V.

1. "Advertising Injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a per-

---

**11.** The page number refers to the number stamped at the bottom of the exhibit.

son's or organization's goods, products, or services;

\* \* \*

13. "Personal injury" means injury, other than "bodily injury" arising out of one or more of the following offenses:

\* \* \*

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, or;

(*Id.* AIG POL 837 and 873.) [12]

Illinois National issued annual CGL policies to at least one of the Plaintiffs between April 2002 and April 2004. (Plaintiffs' Brief 6–7; Defendant's Brief 3.) Without dispute, Illinois National issued an insurance policy, GL 612–52–12, to Alticor effective from April 1, 2002, through Apri 1, 2003. (Defendant's Brief Ex. B "02/03 Policy.") The 02/03 Policy contains a similar, but not identical, provision for coverage of personal and advertising injuries. (*Id.* AIG POL 600.) The 02/03 Policy also contains a similar, but not identical, definition of "personal and advertising injury." (*Id.* AIG POL 609.)

Both policies contain "other insurance" provisions. Both other insurance provisions begin as follows:

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

(98/99 Policy AIG POL 836; 02/03 Policy AIG POL 606.) Both policies contain identical provisions for contribution obligations.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance and none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(98/99 Policy AIG POL 836; 02/03 Policy AIG POL 607.) Finally, both policies contain identical endorsements altering the provision for excess insurance.

b. Excess Insurance

This insurance is excess over any of the other insurance whether primary, excess, contingent or on any other basis:

(1) Unless such insurance is specifically purchased to apply as excess of this policy, or

(2) you are obligated by contract to provide primary insurance.

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's right against all those other insurers.

(98/99 Policy AIG POL 915; 02/03 Policy AIG POL 655.)

---

12. The policy contains an endorsement altering the definition of "personal injury."

## ANALYSIS

The parties have not argued that any portion of the relevant insurance policy is ambiguous. The parties, however, do not agree on the appropriate interpretation of Michigan law, as it applies to the underlying facts and the insurance policy. The parties also disagree on whether the facts giving rise to certain claims in the amended complaint in the lawsuit filed in Missouri trigger coverage under the 1998–1999 policy issued by National Union.

National Union asserts, and Plaintiffs do not expressly disagree, that the primary reason that Plaintiffs seek coverage under the 98/99 policy is financial. In its motion, National Union argues that all of the policies purchased by Plaintiffs are "fronting" or "matching deductible" policies. For example, the 98/99 policy has a $2 million per-occurrence limit and a $2 million deductible, or self-insured retention. The 98/99 policy, however, provides that National Union will reimburse Amway's defense costs to the extent that those costs exceeded the $2 million deductible. Beginning with the 99/00 policy, Amway opted to retain all responsibility for its defense costs. In other words, if the 98/99 policy provides coverage, any defense costs over $2 million would be paid for by National Union. If, however, the claim falls under a later issued policy, Plaintiffs would bear all defense costs under those policies.

### A. National Union's Motion for Summary Judgment and Plaintiffs' Motion for Summary Judgment

National Union argues, based on the language in the *Nitro* Amended Complaint, the alleged injurious falsehood occurred during or after April 2002. National Union argues this conclusion is supported by Plaintiffs' motion, in the *Nitro* action, to dismiss the amended complaint and also the *Nitro* plaintiffs' response to the motion to dismiss. National Union argues that its 98/99 CGL does not apply because the factual assertions in support of the claims trigger coverage under the 02/03 CGL issued by Illinois National. National Union argues both policies have "other insurance" provisions and, under Michigan law, in such a situation, the policy that is more clearly applicable should be the primary policy.

Plaintiffs argue that, under Michigan law, National Union had a duty to defend it under the 98/99 policy. Plaintiffs contend that, looking beyond the allegations in the complaint, the discovery answers indicate the false statements were made as early as 1998. Plaintiffs argue coverage was triggered by the claim for injurious falsehood and the claim for conspiracy to defame. Plaintiffs further argue that, by denying coverage, National Union breached its duty to defend. As a result, Plaintiffs insist that National Union is liable for damages caused by its breach, including defense costs incurred after the amended complaint was served. Plaintiffs argue National Union is not entitled to the benefit of the deductible. Plaintiffs also seek 12% interest on untimely paid insurance benefits.

### 1. Duty to Defend Under Michigan Law

 "In determining whether there is a duty to defend, courts are guided by established principles of contract construction." *Citizens Ins. Co. v. Secura Ins.*, 279 Mich.App. 69, 74, 755 N.W.2d 563 (2008). An insurer's duty to defend is well-settled in Michigan law. *See American Bumper and Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51, 550 N.W.2d 475 (1996) and *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 159, 476 N.W.2d 374 (1991). An insurer's duty to defend depends on the allegations made in the complaint by a third party against the

insured. *Protective Nat'l Ins.*, 438 Mich. at 159, 476 N.W.2d 374 (quoting *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 141–142, 301 N.W.2d 832 (1981)); *see Guerdon Indus., Inc. v. Fidelity & Cas. Co. of New York*, 371 Mich. 12, 18, 123 N.W.2d 143 (1963) ("It is settled that the insurer's duty to defend the insured is measured by the allegation in plaintiff's pleading.") The duty to defend, however, is not limited by the specific language of the pleadings, and the insurer has an obligation to look behind the allegations when analyzing the claim. *American Bumper*, 452 Mich. at 452, 550 N.W.2d 475 (quoting *Protective Nat'l Ins.*, 438 Mich. at 159, 476 N.W.2d 374), *see Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir.1995) ("[T]here is no requirement that the court look only at the complaint and no further to determine whether there is a duty to defend. Michigan courts have repeatedly held that "[t]he duty to defend cannot be limited by the precise language of the pleadings." ") (quoting *Detroit Edison*, 102 Mich.App. at 142, 301 N.W.2d 832). Even when the complaint does not contain allegations that would give rise to a duty to defend, a duty to defend may arise during discovery. *See, e.g., Sarkis v. Cincinnati Ins. Co.*, No. 280860, 2008 WL 4891487, at *2 (Mich.Ct. App. Nov. 13, 2008) (per curiam) (holding that, even though the complaint only alleged intentional acts, which did not give rise to a duty to defend, deposition testimony raised the possibility that the underlying incident was not intentional, creating a factual question whether coverage was arguable).

 The duty to defend is broader than the duty to indemnify. *American Bumper*, 452 Mich. at 450–51, 550 N.W.2d 475; *Secura Ins.*, 279 Mich.App. at 74, 755 N.W.2d 563. The insurer's duty to defend arises under the policy "if there are any theories of recovery that fall within the policy." *American Bumper*, 452 Mich. at 452, 550 N.W.2d 475 (quoting *Protective Nat'l Ins.*, 476 N.W.2d at 381); *see Auto Club Grp. Ins. Co. v. Burchell*, 249 Mich. App. 468, 480–81, 642 N.W.2d 406 (2001) ("It is well established that an insurer has a duty to defend an insured and that such duty 'is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage.' ") (quoting *Detroit Edison*, 102 Mich. App. at 142, 301 N.W.2d 832) (emphasis added in *Auto Club*). The Michigan Court of Appeals summarized the insurer's obligation when determining whether it has a duty to defend as follows:

> The fact that a third party complainant has drafted his complaint in general terms should not work to the detriment of an insured. A defendant has no power to amend a complaint which contains an incomplete statement of facts. Whether a defendant can obtain a defense from his insurer must not depend on the caprice of the third party draftsmanship, nor the limits of his knowledge, but on a potential shown in the complaint that the facts ultimately proved come within the coverage. *Detroit Edison, supra.* It is the *insurer's* duty to look beyond the third party's allegations to analyze whether coverage is possible. *Id. See e.g., Kangas v. Aetna Casualty & Surety Co.*, 64 Mich.App. 1, 235 N.W.2d 42, *lv. den.* 395 Mich. 787 (1975); *Montgomery v. Hawkeye Security Ins. Co.*, 52 Mich.App. 457, 217 N.W.2d 449 (1974), *lv. den.* 392 Mich. 769, 219 N.W.2d 613 (1974).

*Jonesville Prods., Inc. v. Transamerica Ins. Group*, 156 Mich.App. 508, 512–513, 402 N.W.2d 46 (1987), *rejected on other grounds by Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 208, 476 N.W.2d

392 (1991).[13] Any doubt whether the complaint against the insured alleges a claim for which the insurer must provide a defense should be resolved in the insured's favor. *American Bumper*, 452 Mich. at 452, 550 N.W.2d 475; *Protective Nat'l*, 438 Mich. at 159, 476 N.W.2d 374. The duty to defend extends to theories of liability asserted against the insured that are not covered by the policy, so long as there is one theory of recover that arguably falls within the scope of the policy. *Protective Nat'l*, 438 Mich. at 159, 476 N.W.2d 374 (quoting *Dochod v. Cen. Mut. Ins. Co.*, 81 Mich.App. 63, 264 N.W.2d 122 (1978)).

The inquiry begins by examining the allegations in the *Nitro* Amended Complaint. Based on the terms of the 98/99 policy and Michigan law, the facts alleged in the amended complaint, and the theories under which recovery was sought, the filing of the amended complaint did not trigger a duty to defend under that policy. The factual allegations in the amended complaint, which support the claim for injurious falsehood, refer to events that occurred after 1999. The Team In Focus allegations outlined in Paragraphs 108 and 122 refer to events occurring between mid–2000 and 2002. More specifically, the injurious falsehood claim, in paragraph 216, references paragraphs 128 and 134. Paragraph 128 refers to events that occurred in the fall 2002 and a letter dated October 25, 2002. Paragraph 134(a) details the allegedly false statements that were made, but does not identify any dates on which the statements were made.

The civil conspiracy claim in the amended complaint also did not trigger a duty to defend upon the filing of the amended complaint. Again, the dates in the amended complaint do not allege that any aspects of the conspiracy occurred during the time the 98/99 policy was in effect. The civil conspiracy count was included in the original complaint, and the amended complaint simply adds, as part of the conspiracy, the allegation that the there was an agreement "to make or spread injurious falsehoods." (Compare *Nitro* Compl. ¶ 162 *with Nitro* Amended Compl. ¶ 224.) Paragraphs 216 and 217 of the amended complaint explain how the allegedly injurious statements were used as a part of the alleged conspiracy. Under Missouri law, the civil conspiracy claim relies on the underlying allegation of spreading injurious falsehoods. *Greene*, 372 S.W.3d at 890; *Roth*, 120 S.W.3d at 777. The civil conspiracy claim is a means of holding the defendants jointly and severally liable for the injurious falsehoods. Thus, under the civil conspiracy claim, the defendants there, Plaintiffs here, could be held liable for the civil conspiracy even if they did not make the injurious falsehoods.

Although the allegations in the *Nitro* Amended Complaint did not trigger coverage under the 98/99 policy, coverage was triggered under the 98/99 policy as the result of the answers produced by the *Nitro* plaintiffs during discovery. *Cf.*, *Sarkis*, at *2. When determining whether an insurer has a duty to defend, the insurer must not stop at the factual allegations in the complaint and must "look beyond the allegations to analyze whether coverage is possible." *Jonesville Prods.*, 156 Mich.App. at 512–13, 402 N.W.2d 46. When asked when the alleged false and injurious statements were made, the *Nitro* plaintiffs asserted that the statements were made as far back as 1998 and 1999. (Answers to Alticor Interrogatories PgID 16.) National Union became aware of the factual allegations contained in the discov-

---

**13.** In *Upjohn*, the Michigan Supreme Court rejected the definition of "sudden and accidental" used in *Jonesville. See Matakas v.* *Citizens Mut. Ins. Co.*, 202 Mich.App. 642, 651, 509 N.W.2d 898 (1993).

ery responses when Plaintiffs sent the Response Letter dated January 19, 2007.

 Based on the discovery responses, coverage under the 98/99 policy is *arguable* and any doubt about coverage must be resolved in favor of the insured. Coverage is triggered even when the claims are groundless, false or fraudulent, so long as the allegations against the insure *even arguably* come within the policy coverage.[14] *See Auto Club Grp. Ins.*, 249 Mich.App. at 480–81, 642 N.W.2d 406. The policy covers those sums for which Amway would become legally obligated to pay because of a personal or advertising injury. (98/99 Policy AIG POL 831.) The definitions of "person injury" and "advertising injury" include the publication of material that disparages a person's or organization's goods, products or services. (*Id.* AIG POL 837 and 873.) The allegations in the amended complaint "fit neatly" within the personal injury provision. *Nitro II*, at *4. The record conclusively establishes an arguable basis for finding that the allegedly false representations were made during the 98/99 policy period.

### 2. "Other Insurance" Provision Under Michigan Law

 Michigan courts have limited insurance recovery on the basis of "other insurance" provisions. *See, e.g., Kozak v. Detroit Auto. Inter–Ins. Exchange*, 79 Mich.App. 777, 781–82, 262 N.W.2d 904 (1978) (per curiam) ("The rule in Michigan, in accord with Horr and Arminski, is that the insurer's liability under a policy containing an 'other insurance' clause is limited to the amount on the face of the policy. When an insurer issues multiple insurance policies, each providing uninsured motorist coverage and containing an 'other insurance' clause, the insured party may not pyramid his damages, but can recover only the maximum amount to which he is limited by the 'other insurance' clause."). However, " '[o]ther insurance' refers only to two or more policies insuring the same risk, and the same interest, for the benefit of the same person, during the same period." Douglas Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance, and Self Insurance*, 22 Pepp. L. Rev. 1373, 1376 (1995); *see Frankenmuth Mut. Ins. Co., Inc. v. Cont'l Ins. Co.*, 450 Mich. 429, 438, 537 N.W.2d 879 (1995) ("*Frankenmuth Mut.*") (concerning the identification of the primary insurance policy, "the next inquiry should be whether the terms of the polices at issue cover the same loss, the same risk, and the same subject matter."); *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich.App. 706, 721, 444 N.W.2d 813, 819–20 (1989) *rev'd on other grounds* 438 Mich. 197, 476 N.W.2d 392 (1991) (upholding the trial court's decision that the "other insurance" provision did not apply "because it did not cover the same risks, interests, and subject matter.").

Federal courts have consistently held that successive or consecutively issued insurance policies do not implicate "other insurance" provisions within those policies. *See, e.g., Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1079 (7th Cir. 2004) ("But this analysis does not fit the case in which the two policies, each with an 'other insurance' clause, insure merely the same *kind* of risk, but not the same risk because the policies are successive.

---

**14.** At various times in the briefs filed here, the parties insist that their claims about whether coverage was triggered or not triggered are supported by arguments advanced in briefs during the course of litigation in the *Nitro* action. For the purpose of determining whether coverage was triggered, the parties' reliance on those briefs is misplaced. Coverage is triggered by the claims and allegations, even when ultimately groundless or frivolous, and not whether the plaintiff later proves, or fails to prove, the allegations to be true.

To apply 'other insurance' clauses in such a case would make insurers liable in part for occurrences outside the period covered by their policies."); *Century Indem. Co. v. Liberty Mut. Ins. Co.*, 815 F.Supp.2d 508, 516 (D.R.I.2011) ("The other insurance clauses function to prevent double recovery where two or more insurers concurrently cover the same risk; they are inapposite to the issue of how to allocate defense costs between successive coinsurers.") (collecting cases); *Devington Condo. Assoc. v. Steadfast Ins. Co.*, No. C06–1213, 2007 WL 869954, at *4 (W.D.Wash. Mar. 20, 2007) ("The Court concludes that 'other insurance' clauses do not apply here where the at-issue policies provided consecutive rather than concurrent insurance coverage.") (collecting authority). State Supreme Courts, generally, have reached the same conclusion; "other insurance" provisions within policies apply only when the policies are concurrent, not when the policies are consecutive. *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 268 P.3d 180, 184 (Utah 2012) ("But such 'other insurance' provisions do not apply to successive insurers."); *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 362 n. 36, 910 N.E.2d 290 (2009) ("However, 'other insurance' clauses are not intended to allocate liability among successive insurers because they do not insure the same risk and would unjustly make consecutive insurers liable for damages occurring outside their policy periods.") (quoting 23 E.M. Holmes, Appleman on Insurance § 145.4[C] at 34 (2d ed. 2003)); *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 315 Wis.2d 556, 580, 759 N.W.2d 613 (Wis.2009) ("The accepted meaning of 'other insurance' provisions does not include application to successive insurance policies."); *Carter–Wallace, Inc. v. Admiral Ins. Co.*, 154 N.J. 312, 321–22, 712 A.2d 1116 (N.J.1998) ("We also considered the effect on the allocation issue of 'other insurance' clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss. We determined that such clauses were not generally applicable in the continuous-trigger context where successive rather than concurrent policies were at issue." (citation omitted)).

Because the two policies, the 98/99 policy and the 02/03 policy were part of a series of consecutively issued policies, they were not concurrent and did not insure the same risks. The policy language in Section I, Coverage B 1 of the 98/99 policy limits the application of the insurance to offenses committed during the policy period. (98/99 Policy AIG Pol 831.) On this issue, Michigan law coincides with a host of authorities and other jurisdictions. Contrary to Defendant's assertion, Michigan courts have not rejected this general rule. In *Arco Indus. Corp. v. American Motorists Ins. Co.*, 232 Mich.App. 146, 594 N.W.2d 61 (1998), a panel of the Michigan Court of Appeals, on second remand, faced a situation similar to this one. Arco had been sued by the Michigan Department of Natural Resources for environmental pollution. For eighteen years prior to the lawsuit, Arco had purchased comprehensive general liability policies from as many as seven different companies. After resolving other issues, the court held that "coverage was triggered—that is, that there was an injury-in-fact as defined in *Arco II* [*Arco Industries Corp. v. American Motorists Ins. Co.*, 456 Mich. 305, 572 N.W.2d 617 (1998)]—under each successive comprehensive general liability policy in effect during the twenty years between the time Arco began operating the facility and the cessation of wastewater discharges into its seepage lagoon in 1987." *Id.* at 159, 594 N.W.2d 61. The court then considered five possible methods for allocating liability among successive insurers, and applied the time-on-the-risk method of ap-

portionment. *Id.* at 161, 594 N.W.2d 61. Finally, the court rejected the application of the "other insurance" provisions in the various CGL policies because "this case involves consecutive policies covering different policy periods." *Id.* at 165, 594 N.W.2d 61. *Arco* was affirmed by equal division by the Michigan Supreme Court.[15] *Arco Indus. Corp. v. American Motorists Ins. Co.*, 462 Mich. 896, 617 N.W.2d 330 (2000) (table order).

Almost one year after *Arco* was released for publication, but before the Michigan Supreme Court resolved the appeal, a different panel of the Michigan Court of Appeals commented on the holding in *Arco. See Dow Corning Corp. v. Cont'l Cas. Co., Inc.*, Nos. 200143–200154, 1999 WL 33435067 (Mich.Ct.App. Oct. 12, 1999) (per curiam) *application for leave to appeal denied*, 463 Mich. 854, 617 N.W.2d 554 (2000). *Dow Corning* was a case related to the litigation surrounding silicone breast implants. The lawsuit was brought by Dow Corning against the insurance companies that did not accept liability or did not settle their disputes. The panel in *Dow Corning* disagreed with *Arco;* "we are not persuaded by the reasoning in *Arco*, and we find *Arco* to be factually distinguishable from the present case." *Id.*, at *7. The panel found three problems with the legal conclusions in *Arco:* (1) the analysis was not grounded in the language of the insurance policy, (2) the *Arco* panel did not distinguish between the trigger of coverage and the scope of coverage, and (3) any ambiguity should be resolved against the insurer. *Id.* The panel also found two factual distinctions. The policy at issue in *Dow Corning* did not limit an occurrence to accidents, which typically have limited duration. *(Id.)* Also, the policy in *Dow Corning* explicitly continued coverage

when the occurrence continued after the termination of the policy. *Id.*, at *8.

The *Dow Corning* opinion does not lead to the conclusion that the Michigan Supreme Court would conclude that "other insurance" provisions apply to successive or consecutive insurance policies. Neither *Dow Corning* nor *Arco* involved "other insurance" provisions. Rather, the relevant holdings, on which the parties here rely, concerned the proper allocation of damages. Extending the scope of "other insurance" provisions to encompass successive or consecutive insurance policies is "seriously flawed." Richmond, *Issues and Problems in "Other Insurance,"* at 1336. "Other insurance" provisions "only affect insurers' rights among themselves: they do not affect the insured's right to recovery under each concurrent policy." *Id.* at 1380.

To the extent that either *Arco* or *Dow Corning* are applicable to "other insurance" provisions, subsequent authority has found that the Michigan Supreme Court would likely side with *Arco*, not *Dow Corning. See Cont'l Cas. Co. v. Indian Head Indus., Inc.*, No. 05–73918, 2010 WL 188083, at *8 (E.D.Mich. Jan. 15, 2010) (Hood, J.) (considering the approaches *Arco* and *Dow Corning* and concluding that "the pro rata time-on-the-risk method must be applied in this case."). This Court finds the reasoning in *Indian Head* persuasive. The other authority cited by National Union on this issue does not require a different result. In each case, the policies at issue were concurrent, not consecutive. *See Frankenmuth Mut.*, 450 Mich. at 454–55, 537 N.W.2d 879 (identifying the two policies relevant to the auto accident); *Heinen v. Illinois Farmers Ins. Co.*, 566 N.W.2d 378, 379 (Minn.Ct.App.1997) (iden-

**15.** After briefing and oral argument, three justices voted to affirm the Court of Appeals and three justices voted to reverse. Justice Corrigan, because she was on the panel at the Court of Appeals, did not participate.

tifying the two insurance policies relevant to the auto accident); *Nabisco, Inc. v. Transport Indem. Co.*, 143 Cal.App.3d 831, 192 Cal.Rptr. 207 (Cal.Ct.App.1983) (involving an umbrella policy, a primary automobile liability policy, and an excess coverage policy); *Kozak*, 79 Mich.App. at 779, 262 N.W.2d 904 (identifying the three policies relevant to the auto accident).

Having found that the other insurance provision does not apply, Plaintiffs' claim that National Union waived this defense by failing to raise it in the denial letter is moot.

### 3. Defense Costs As the Result of a Breach of Duty

██ A breach of the insurance policy occurred when National Union was given notice of the *Nitro* plaintiffs' interrogatory answers and then refused to provide coverage. *Cf., United States v. Wapinski Real Estate*, No. 99c100, 2000 WL 284299, at *2 (N.D.Ill. Mar. 6, 2000) (holding that the insurance company did not breach its duty to defend until it had notice of information produced in discovery). Under Michigan law, when an insurer wrongfully declines to defend, the insurer is liable for the costs of the defense. *North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983, 986 (6th Cir.1997) (citing *Detroit Edison*, 102 Mich.App. at 144–45, 301 N.W.2d 832); *see Cooley v. Mid–Century Ins. Co.*, 52 Mich.App. 612, 616, 218 N.W.2d 103 (1974) ("An insurer who wrongfully refuses to defend an action against the insured, on the ground that the action was not within the coverage of the policy, is liable for reasonable attorney fees incurred by the insured in the defense of the action brought against them.") (citing *City Poultry & Egg Co. v. Hawkeye Cas. Co.*, 297 Mich. 509, 298 N.W. 114 (1941)).

██ However, the damages that can be awarded for a breach of an insurance contract are limited to the economic loss suf-

fered by the insured. *See Stryker Corp. v. XL Ins. America*, 681 F.3d 806, 814 (6th Cir.2012) (citation omitted). The Sixth Circuit explained that, in Michigan, insurance policies are treated the same as any other commercial contract. *Id.* "Therefore, the standard contract rule that any damages beyond the value of the contract must be proven 'to arise naturally from the breach or those that were in contemplation of the parties at the time the contract was made.'" *Id.* (citation omitted). In *Stryker*, the circuit court reversed the district court's decision that the self-insured retention and aggregate limits of liability within the policy did not apply because XL breached its duty to defend. *Id.* at 814–15. The Sixth Circuit noted that the district court relied on *Capitol Reproduction, Inc. v. Hartford Ins. Co.*, 800 F.2d 617, 624 (6th Cir.1986), an opinion that relied on contract rules since repudiated by the Michigan Supreme Court. *Id.* at 814–15.

██ Plaintiffs are not entitled to recover the amount of the deductible under the 98/99 policy. Even though National Union breached the policy, under Michigan law, Plaintiffs would be responsible for the first $2 million in costs for their defense, as that was the agreement in the insurance policy. Plaintiffs could not have suffered damages for the first $2 million in defense costs by any breach because Plaintiffs agreed to pay the first $2 million in defense costs. The authority on which Plaintiffs rely in their brief, *Capitol Reproduction*, has since been fatally undermined by the holding in *Stryker*.

### 4. Interest on Untimely Paid Insurance Benefits

██ Plaintiffs seek an award of 12% interest on any untimely paid insurance benefits. National Union does not address this issue in its response brief. Under Mich. Comp. Laws § 500.2006(4), when in-

surance benefits are not timely paid, the benefits bear "simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, . . . ." Whether the claim was reasonably in dispute is not a defense to the failure to timely pay the benefits. *See Griswold Props., LLC v. Lexington Ins. Co.*, 276 Mich.App. 551, 566, 741 N.W.2d 549 (2007).

Under § 500.2006(4), Plaintiffs are entitled to simple interest on the unpaid benefits submitted to, but not paid by, National Union.

## B. Defendant's Contingent Partial Motion for Summary Judgment

National Union filed this motion as contingent upon the denial of its prior motion for summary judgment. In the event this Court finds National Union was obligated to provide coverage under its 98/99 policy, through this motion, National Union seeks an order allocating costs. National Union argues that the "other insurance" provisions, if they cannot be reconciled, require a pro rata allocation of costs between National Union and Illinois National, a time-on-the-risk allocation of costs. National Union argues that the costs should be equally apportioned among the policies. National Union argues, because Plaintiffs were functionally self-insured under some of the policies, Plaintiffs would share the costs of the defense.

■■■ There exist two primary methods of allocating defense costs among consecutive insurers: pro rata and joint and several. *See United States Fid. and Guar. Co. v. Cont'l Ins. Co.*, No. CV–04–29–BLG–RFC, 2010 WL 4102250 (D.Mont. Oct. 18, 2010). Michigan courts and the Sixth Circuit have applied the pro rata, or time-on-the-risk, method for allocating damages and costs for situations involving consecutively issued insurance policies. *See Budd Co. v. Travelers Indemn. Co.*, 820 F.2d

787, 790–91 (6th Cir.1987) (allocating defense costs); *Ins. Co. of North America v. Forty–Eight Insulations*, 633 F.2d 1212, 1224–25 (6th Cir.1980) (allocating defense costs); *Arco Indus. Corp.*, 232 Mich.App. at 159–164, 594 N.W.2d 61 (allocating indemnifiable losses); *see also Indian Head*, at *5–*6 (discussing apportionment of both defense costs and liability and following *Forty–Eight Insulations* and *Arco* ); *Century Indemn. Co. v. Aero–Motive Co.*, 318 F.Supp.2d 530, 544–45 (W.D.Mich.2003) (same).

■■■ In situations where the insured had multiple, consecutively issued policies, or included periods of self-insurance, courts have applied time-on-the-risk to allocation of defense costs when some of the defense costs were related to claims arising across the policy periods. *Forty–Eight Insulations*, 633 F.2d at 1224; *Aero–Motive*, 318 F.Supp.2d at 545. The rationale for apportionment of defense costs is that the insurer should not be held responsible for those costs associated with defending occurrences that occurred outside the policy period. *Budd*, 820 F.2d at 791 (quoting *Forty–Eight Insulations*, 633 F.2d at 1224–25); *Aero–Motive*, 318 F.Supp.2d at 545. In order to apportion costs, however, there must be some reasonable means of prorating the costs between the covered and the uncovered claims. *Budd*, 820 F.2d at 791; *Forty–Eight Insulations*, 633 F.2d at 1224 (citation omitted); *Aero–Motive*, 318 F.Supp.2d at 545. Courts have found it reasonable to prorate defense costs in the same manner that damages or indemnifiable losses are apportioned. *Forty–Eight Insulations*, 633 F.2d at 1225; *Aero–Motive*, 318 F.Supp.2d at 545.

■■■ The 98/99 policy language supports the application of a pro rata, or time-on-the-risk, approach to defense costs. The relevant language is found in Coverage B, sections 1a and 1b, which was quot-

ed earlier. National Union is obligated to pay damages for personal injuries and advertising injuries for which the insured becomes legally obligated to pay. (98/99 Policy AIG POL 831.) National Union has a duty to defend the insured in any lawsuit seeking those damages. (*Id.* Section B1a.) National Union has no duty to defend, however, if "this insurance does not apply." (*Id.*) "This insurance" applies to personal injuries and advertising injuries "caused by an offense," "but only if the offense was committed in the 'coverage territory' during the policy period." (*Id.* Section B1b.) In other words, under this portion of the policy, National Union has a duty to defend the insured only for offenses that occurred during the 98/99 policy period that caused personal or advertising injuries. This portion of the policy would not give rise to a duty to defend personal or advertising injury claims caused by an offense that occurred outside the policy period. Of course, the duty to defend, once triggered, extends to all claims, so National Union must identify some reasonable means of allocating defense costs across policy periods.

Having found that the policy and legal precedent support the conclusion that defense costs may be allocated using a time-on-the-risk approach, the Court finds, at this point, no reasonable basis for allocating defense costs. In order to allocate costs, there must be some determination that a duty to defend, or potentially a duty to indemnify, arose during some other policy period. Here, no such determination has been made. Importantly, the two causes of action in the instant complaint are narrow. In the first claim, Plaintiffs seek a declaration that coverage exists under one or more of the policies issued by National Union with an effective date prior to November 1, 1999. (Compl. ¶ 28.) In the second claim, Plaintiffs assert National Union's refusal to defend constitutes a breach of contract. (Compl. ¶ 32.) Equally as important, the record includes allegations that the allegedly false and injurious statements were made as early as 1998 and 1999. The record does not contain any evidence that the allegedly false statements were made earlier than 1998. Plaintiffs have only sued National Union. Plaintiffs have not sued any other insurer. The complaint, as written, requires the Court to examine National Union's policies issued prior to November 1, 1999. The complaint, as written, does not ask the Court to examine any insurance policy issued to Plaintiffs after November 1, 1999. National Union has not indicated that any other insurer is a necessary party to this action. National Union has not filed any cross-claim, counter-claims or third-party claims. National Union did not include allocation of defense costs as an affirmative defense.[16] In other words, *only* the 98/99 policy is at issue before this Court. Based on the parties to this lawsuit, and the issues raised in the complaint, the question of whether any other policy's coverage was triggered by the complaint is simply beyond the scope of the controversy presented.

The fact that Illinois National agreed that the complaint gave rise to a duty to defend under the 02/03 policy does not alter this conclusion. Illinois National is not a party to this lawsuit. The coverage of the 02/03 policy is not an issue in this lawsuit. Illinois National has not been afforded an opportunity to defend the terms and conditions of its policy in this matter. The fact that the policies issued after 98/99 are fronting policies also does

---

**16.** The Court simply notes this fact. The Court has not determined that allocation of costs must be raised as an affirmative defense.

not alter this conclusion. The practical effect of a fronting policy is that Plaintiffs are self insured. *See Corwin v. Daimler-Chrysler Ins. Co.*, 296 Mich.App. 242, 248 n. 3, 819 N.W.2d 68 (2012). Plaintiffs were not, however, conducting business without insurance policies. Those policies have terms and conditions that must be met before coverage is triggered, even if the costs and damages under those policies are ultimately born by Plaintiffs. Because the company or companies that issued those policies are not part of this lawsuit, and because this Court has not been asked to interpret those policies, this Court has no basis for allocating defense costs during the periods covered by those fronting policies.

### CONCLUSION

National Union's motion for summary judgment (ECF No. 26) is DENIED. National Union had a duty to defend Plaintiffs when Plaintiffs tendered the interrogatory answers to National Union on January 19, 2007. As a result of the dates disclosed in the interrogatory answers, the injurious falsehood claim in the amended complaint arguably occurred during the 98/99 policy period. The other insurance provision in the 98/99 policy does not apply to consecutively issued policies.

Plaintiffs' motion for summary judgment (ECF No. 28) is GRANTED IN PART and DENIED IN PART. The duty to defend was triggered when the interrogatory answers were tendered to National Union. By failing to defend under the 98/99 policy, National Union breached its contract. However, that breach does not require National Union to forgo the benefit of its bargain and National Union is entitled to the benefit of any deductible under the 98/99 policy. Plaintiffs are entitled to the statutory interest rate on untimely paid insurance benefits.

National Union's contingent motion for partial summary judgment (ECF No. 31) is DENIED, without prejudice. Although case law and the 98/99 policy indicate that allocation of defense costs would be permitted, at this point there is no reasonable basis for allocation of defense costs. On the record before this court, no other insurer and no other policy has been found to be required to provide a defense or indemnity for the underlying lawsuit.

### *ORDER*

For the reasons provided in the accompanying Opinion, **IT IS HEREBY ORDERED** that

1. National Union's motion for summary judgment (ECF No. 26) is **DENIED;**

2. Plaintiffs' motion for summary judgment (ECF No. 28) is **GRANTED IN PART and DENIED IN PART;**

3. National Union's motion for partial summary judgment (ECF No. 31) is **DENIED, without prejudice.**